MELISSA HOLYOAK, United States Attorney (#9832)
MARK E. WOOLF, Assistant United States Attorney (WA #39399)
MARK Y. HIRATA, Assistant United States Attorney (#5087)
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Telephone: (801) 524-5682

---

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    vs.<br><br>RODNEY SKYLES,<br><br>    Defendant. | INFORMATION<br><br>COUNT 1:  18 U.S.C. §§ 1343 and 2, Wire Fraud<br><br>COUNT 2: 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2, Promotional Money Laundering<br><br> Case No. 2:26-cr-00040-JNP |

The United States Attorney charges:

### I.    BACKGROUND

At all times relevant to this information:

1.      Defendant RODNEY SKYLES ("SKYLES") was a resident of Eagle, Idaho.

2.　　　SKYLES was the owner of RODNEY E. SKYLES SOLE PROPRIETORSHIP ("RESSP"), an Idaho company.

3.　　　SKYLES had signatory authority and joint control over a bank account held at JP Morgan Chase Bank ending in 6809 ("Account 6809").

4.　　　Co-Schemer Peter McDonald ("CS1") owned and managed Premier Small Business Services, Inc. ("Premier Small Business"), a Utah corporation purportedly engaged in the business of providing, among other things, payroll services. During the scheme and artifice to defraud alleged herein, CS1 brokered loans funded and/or guaranteed by the Small Business Administration ("SBA") for small businesses during the COVID-19 pandemic under false and fraudulent pretenses. Premier Small Business served primarily as a pass-through entity for fraudulently obtained COVID loan proceeds under the guise of payroll. CS1 also co-owned and controlled, among other accounts, a business account ending in 3708 at First Utah Bank in the name of Premier Small Business ("Account 3708"). Account 3708 facilitated, among other things, CS1's control over fraudulent loan proceeds, including transferring proceeds to small businesses under the guise of payroll and keeping his share of ill-gotten gains.

5.　　　Co-schemer Royce Monson ("CS2") was involved in a business called KVF Healing, LLC, a Utah company. CS2 assisted CS1 by identifying small businesses either impacted by or in existence before the COVID-19 pandemic for purposes of obtaining government-funded loans during the COVID-19 pandemic under false and fraudulent pretenses.

6.      A10 Capital, LLC ("A10 Capital"), which is based in Idaho, was a commercial real estate lender and an authorized third-party lender under the Paycheck Protection Program established by Congress during the COVID-19 pandemic. A10 Capital utilized Western Alliance Bank, which is based in Arizona, a member bank within the Federal Reserve System, for all wire transfers of loan funds approved and disbursed under the Paycheck Protection Program. Each wire transfer by A10 Capital alleged herein involved an interstate wire transmission through the Fedwire system to Western Alliance Bank's regional Federal Reserve Bank in San Franciso, California.

### The COVID-19 Pandemic and Paycheck Protection Program

7.      By March 2020, the COVID-19 pandemic had threatened the United States economy. Offices, restaurants, and businesses began closing. In response, Congress acted to keep businesses afloat through legislation to help protect millions of workers, business owners, and citizens from economic disruption caused by the pandemic.

8.      To facilitate this economic rescue effort, on March 25, 2020, Congress passed the Coronavirus, Aid, Relief, and Economic Security Act, 15 U.S.C. § 9001 *et seq.* (the "CARES Act"). The CARES Act was designed to provide emergency financial assistance to millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. The President of the United States signed the CARES Act into law on March 27, 2020.

9.      The SBA is an executive branch agency of the United States government that supports entrepreneurs and small businesses. The mission of SBA is to maintain and strengthen the nation's economy by enabling the establishment and viability of small

businesses and by assisting in the economic recovery of communities after disasters. As part of this effort, the SBA enables and provides loans through banks, credit unions, and other lenders. Some of these loans have government-backed guarantees.

10.     One form of assistance provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small business for job retention and certain other expenses through the Paycheck Protection Program ("PPP"), which was originally signed into law in March 2020 with additional funding authorized on or about December 27, 2020, and March 11, 2021.

11.     The PPP Program, which is operated by the SBA, provided small businesses with funding to meet specific obligations, including payroll and rent. The PPP Program permitted participating third-party lenders to approve and disburse SBA backed PPP loans to cover payroll, fixed debts, utilities, rent/mortgage, accounts payable, and other bills incurred by qualifying businesses during, and resulting from, the COVID-19 pandemic. PPP loans were fully guaranteed by the SBA. In the event of default, the SBA would fully satisfy the lender for any balance remaining on the loan. Further, the SBA would forgive any loan up to 100 percent if the borrower established it had utilized 60 percent of the loan on payroll costs in the 24-week period post-disbursement, with the remaining 40 percent going toward covered mortgage interest payments, covered rent payments, covered utilities, covered expenditures, covered property damages costs, covered supplier costs, and covered worker protection expenditures. Whatever was not forgiven was serviced as a loan.

4

12.    The SBA promulgated regulations concerning eligibility for a PPP loan. To obtain a PPP loan, a qualifying business was required to submit a PPP loan application, which was signed by an authorized representative of the business. The PPP loan application required the business (through its authorized representative) to acknowledge the program rules and  make certain affirmative certifications in order to obtain the PPP loan, including that the business was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on a Form(s) 1099-MISC. Specifically, within the PPP loan application, the small business, through its authorized representative, was required to state: (a) its average month payroll expenses, and (b) its number of employees.

13.    In addition to providing the above information, a business applying for a PPP loan was required to provide documentation showing its payroll expenses. This payroll information was material to the loan application because, pursuant to statutory requirements and implementing regulations, the amount of the loan that typically could be approved was a function of the applicant's historical payroll costs, consisting of compensation to its employees whose principal place of residence was the United States, subject to certain exclusions. Once approved for a PPP loan by a participating third-party lender, small businesses could receive loans of up to $10 million.

14.    By signing a PPP loan application, each applicant attested and certified that the information provided in the application and in all supporting documents and forms submitted with the application were true and accurate, and that the applicant understood that knowingly making a false statement to obtain a PPP loan was a crime.

15.     A PPP loan application was processed by the third-party participating lender with whom the application was filed. If a PPP loan application was approved, the participating lender would fund the PPP loan, which was guaranteed by the SBA. Data from the PPP loan application, including information from the borrower, the total amount of the loan, and the listed number of employees, was transmitted by the lender to the SBA in the course of processing the loan.

16.     PPP loan applications submitted through August 8, 2020, were part of the first and second round of PPP loans. The PPP loan application from the first and second rounds were received through the SBA E-Tran system, whose server was located in Sterling, Virginia. PPP lenders then disbursed the funds to the borrower and submitted disbursement details into the SBA E-Tran system. The SBA transmitted the PPP loan processing fee from the Treasury to the lenders through the Financial Management System ("FMS"), whose primary server was also located in Sterling, Virginia. The lenders would then generally transmit the loans funds to the borrower's bank account as directed by the borrower.

17.     PPP Loan applications submitted after January 11, 2021 were part of the third round of PPP loans. These PPP Loan applications were received through Summit platform, a cloud-based platform utilizing an AWS GOV cloud server located in Oregon. PPP lenders submitted disbursement details into the SBA E-Tran system, which transmitted the PPP processing fee from the Treasury to the lender through the FMS system. During this period, the primary server for the E-Tran and FMS systems was in Sterling, Virginia.

18.     The proceeds of a PPP loan could be used only for certain specified items, such as payroll costs, costs related to the continuation of group health care benefits, or mortgage interest payments. The proceeds of a PPP loan were not authorized to be used by the borrowers to purchase consumer goods, automobiles, personal investments, personal residences, clothing, jewelry, to pay the borrower's federal income taxes, or to fund the borrower's day-to-day living expenses unrelated to the specified authorized expenses.

19.     If a borrower used PPP loan funds for authorized expenses, the borrower could later apply for forgiveness of all loan proceeds properly expended. PPP loan forgiveness applications from borrowers were submitted by PPP lenders to the SBA through the Summit platform. The SBA then transmitted PPP loan forgiveness payments through the FMS system to the PPP lender.

## II.     THE SCHEME AND ARTIFICE TO DEFRAUD

20.     Beginning in or around January 2021, and continuing to on or around at least May 2022, within the District of Utah and elsewhere,

### RODNEY SKYLES

defendant herein, and CS1 and CS2, knowingly devised and intended to devise a scheme and artifice to defraud and to obtain money from PPP lenders and the SBA by means of materially false and fraudulent pretenses, representations and promises, and omissions of material facts.

### III.   MANNER AND MEANS

### *March 27, 2021 PPP Loan*

21.     It was part of the scheme and artifice to defraud, and in execution and furtherance thereof, that SKYLES, CS1, and CS2, on or about March 27, 2021, submitted or caused to be submitted a PPP Loan application on behalf of RESSP to authorized third-party lender A10 Capital, and, on or about April 1, 2021, obtained $80,000 in PPP Loan proceeds that were wired by A10 Capital to SKYLES' Account 6809.

22.     It was further part of the scheme and artifice to defraud, and in execution thereof, that SKYLES, CS1, and CS2 submitted and cause to be submitted the following materially false representations of fact in the RESSP PPP Loan application:

   a. That RESSP had an average monthly payroll of $32,001 when, in fact, it did not;

   b. That RESSP had 4 employees when, in fact, it did not;

   c. That the IRS Form 941 submitted with the PPP Loan application accurately reflected the amount of wages, tips, and other compensation that RESSP had paid employees during the relevant period when, in fact, it did not; and

   d. That the information provided in the PPP Loan application and information provided in the supporting documents and forms was true and correct when, in fact, it was not.

23.     In execution and furtherance of the scheme and artifice to defraud, SKYLES and CS1, through RESSP, conducted the following financial transaction with the PPP Loan proceeds:

   a. On or about April 2, 2021, SKYLES wired $80,000 from Account 6809 to Account 3708 held in the name of Premier Small Business Services.

24.     On or about October 20, 2021, in execution and furtherance of the scheme and artifice to defraud, SKYLES, CS1, and CS2 submitted or caused to be submitted a PPP Loan Forgiveness Application with the following materially false representations:

    a.  That RESSP had 4 employees at the time of the PPP Loan; when in fact, it did not;

    b.  That RESSP had 4 employees at the time of the PPP Loan Forgiveness Application; when in fact, it did not; and

    c.  That RESSP spent the full $80,000 on payroll costs; when in fact, it did not.

25.     On or about November 30, 2021, pursuant to the CARES Act, SBA remitted to the third-party lender of record, A10 Capital, the full amount of PPP Loan funded as a result of SKYLES, CS1, and CS2's March 27, 2021 PPP Loan application, resulting in forgiveness of the fraudulently obtained PPP Loan.

### *April 15, 2021 PPP Loan*

26.     It was further part of the scheme and artifice to defraud, and in execution and furtherance thereof, that SKYLES, CS1, and CS2, on or about April 15, 2021, submitted or caused to be submitted a second PPP Loan application on behalf of RESSP to authorized third-party lender A10 Capital, and, on or about April 22, 2021, obtained $80,000 in PPP Loan proceeds that were wired by A10 Capital to SKYLES' Account 6809.

27.     It was further part of the scheme and artifice to defraud, and in execution thereof, that SKYLES, CS1, and CS2 submitted and caused to be submitted the following materially false representations of fact in the second RESSP PPP Loan application:

a. That RESSP had an average monthly payroll of $32,001; when in fact, it did not;

b. That RESSP had 4 employees; when in fact, it did not;

c. That the IRS Form 941 submitted with the PPP Loan application accurately reflected the amount of wages, tips, and other compensation that RESSP had paid employees during the relevant period; when in fact, it did not; and

d. That the information provided in the PPP Loan application and information provided in the supporting documents and forms was true and correct; when in fact, it was not

28.     On or about March 22, 2022, in execution and furtherance of the scheme and artifice to defraud, SKYLES, CS1, and CS2 submitted or caused to be submitted a second PPP Loan Forgiveness Application with the following materially false representations:

a. That RESSP had 4 employees at the time of the PPP Loan; when in fact, it did not;

b. That RESSP had 4 employees at the time of the PPP Loan Forgiveness Application; when in fact, it did not; and

c. That RESSP spent the full $80,000 on payroll costs; when in fact, it did not.

29.     On or about May 2, 2022, pursuant to the CARES Act, SBA remitted to the third-party lender of record, A10 Capital, the full amount of the PPP Loan funded as a result of SKYLES, CS1, and CS2's April 15, 2021 PPP Loan application, resulting in forgiveness of the fraudulently obtained PPP Loan.

## COUNT 1
## 18 U.S.C. §§ 1343 and 2
## (Wire Fraud)

30.     The factual allegations set forth in paragraphs 1-29 above are incorporated herein by reference.

31.     Beginning in or around January 2021, and continuing to on or around May 2022, within the District of Utah and elsewhere,

**RODNEY SKYLES,**

defendant herein, and CS1 and CS2, knowingly devised and intended to devise a scheme and artifice to defraud and to obtain money from A10 Capital and the SBA by means of material false and fraudulent pretenses, representations, promises, and omissions of material facts described herein, for the purpose executing said scheme and artifice to defraud, did cause to be transmitted by means of wire communication certain writings, signs, signals the following interstate wire transfer of money, and aided and abetted each other therein:

| COUNT | Date | SENDER | RECIPIENT | AMOUNT |
|-------|------|--------|-----------|--------|
| 1 | April 1, 2021 | EFT payment for PPP Loan from A10 Capital to RESSP | SKYLES' Account 6809 | $80,000 |

All in violation of 18 U.S.C. §§ 1343 and 2.

11

**COUNT 2**
**18 U.S.C. §§ 1956(a)(1)(A)(i) and 2**
**(Promotional Money Laundering)**

32.    The factual allegations set forth in paragraphs 1-29 above are incorporated

herein by reference.

33.    On or about the dates alleged below, in the District of Utah and elsewhere,

**RODNEY SKYLES**,

defendant herein, and CS1 and CS2, did knowingly conduct and attempt to conduct a

financial transaction affecting interstate commerce, which involved the proceeds of a

specified unlawful activity, that is Wire Fraud in violation of 18 U.S.C. § 1343, with the

intent to promote the carrying on of a specified unlawful activity (Wire Fraud), and that

while conducting and attempting to conduct the financial transaction, knew the property

involved in the financial transaction represented the proceeds of some form of unlawful

activity, and aided and abetted each other therein:

| COUNT | DATE (On or About) | DESCRIPTION |
|---|---|---|
| 2 | April 2, 2021 | Transfer of $80,000 from SKYLES' Account 6809 into Account 3708 held in the name of Premier Small Business. |

All in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2.

MELISSA HOLYOAK
United States Attorney

Mark E. Woolf
Assistant United States Attorney

12